# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robin A. Fye, Sr., : 
                  Appellant : 
                             : 
                v. :   No. 519 C.D. 2018
                             :   SUBMITTED: September 14, 2018
Commonwealth of Pennsylvania, : 
Department of Transportation, : 
Bureau of Driver Licensing : 

BEFORE:   HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**<u>OPINION NOT REPORTED</u>**

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**                       **FILED: December 7, 2018**

        Licensee, Robin A. Fye, Sr., appeals from an order of the Court of Common Pleas of Centre County (trial court) denying Licensee's statutory appeal and reinstating the one-year suspension of his operating privilege for refusing to submit to chemical testing imposed by the Department of Transportation, Bureau of Driver Licensing (Department) pursuant to Section 1547(b)(1)(i) of the Vehicle Code, *as amended*, 75 Pa. C.S. § 1547(b)(1)(i).[1] On appeal, Licensee argues that the

---

[1] Commonly referred to as the Implied Consent Law, Section 1547(b)(1)(i) provides, in pertinent part, as follows:

> (1) If any person placed under arrest for violation of section 3802 [relating to driving under influence of alcohol or controlled substance (DUI)] is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice

trial court erred in determining that he was capable of making a knowing and conscious decision to refuse to submit to chemical testing despite his hearing loss and alleged inability to read. We disagree and, therefore, affirm.[2]

The facts are as follows.[3] After two state troopers observed Licensee speeding and repeatedly crossing the fog line, they initiated a traffic stop. At that time, they observed that Licensee had slurred speech, bloodshot and glassy eyes, and some form of hearing impairment. Additionally, Licensee admitted that he had been drinking. (Trial Court's May 30, 2018, Opinion (Op.) at 1.) Subsequently, Licensee verbally refused to submit to field sobriety testing, handed over his keys, gave the troopers permission to move his car, and provided them with his address. The troopers transported Licensee to his home a short distance away where they hoped to have his wife speak to him. Instead, the couple "engaged in a verbal altercation which resulted in [Licensee] insulting his wife and the two refusing to communicate any further." (*Id*.) Thereafter, the troopers transported Licensee to the hospital.

At the hospital, the troopers did not provide Licensee with an interpreter or a translating service. Instead, they read him the DL-26 form at which time he

---

by the police officer, the department shall suspend the operating privilege of the person as follows:
    (i) Except as set forth in subparagraph (ii), for a period of 12 months.

75 Pa. C.S. § 1547(b)(1)(i).

[2] The trial court also granted the Department's motion to reconsider and vacate the initial order sustaining Licensee's statutory appeal. Licensee is not appealing from that part of the order.

[3] Although the trial court did not render explicit credibility determinations, it implicitly accepted the state troopers' version of the events by virtue of its opinion. *See Hasson v. Dep't of Transp., Bureau of Driver Licensing*, 866 A.2d 1181, 1186 (Pa. Cmwlth. 2005) (trial court implicitly found the police officer's testimony credible by crediting his account of the events). In addition, the trial court opined that Licensee probably was using his hearing loss as an excuse and was not necessarily being truthful. (December 15, 2016, Hearing, Notes of Testimony (N.T.) at 59-60; Reproduced Record (R.R.) at 47a.)

2

took out his hearing aids and actively refused to acknowledge them when they were attempting to speak with him. (*Id*. at 2 and 4.) Thereafter, when they gave him the DL-26 form to read, he pushed it away without looking at it. Specifically, he "did not attempt to read the form, nor communicate to the troopers he would have difficulty reading [it]." (*Id*. at 2.) Consequently, the troopers recorded a refusal and the Department issued the notice of suspension at issue. Licensee's appeal to the trial court followed.

At the *de novo* hearing, the Department presented the testimony of the two state troopers and Commonwealth Exhibit 1, which, *inter alia*, included the notice of suspension and the DL-26 form.[4] Licensee testified on his own behalf and presented the testimony of his father, who briefly alluded to Licensee's hearing loss and reading and phone skills. Licensee also presented a copy of a card that he carried with him indicating that he was deaf or hard of hearing.[5] Notwithstanding the Department's objection that Licensee did not provide the card to the troopers, the trial court admitted the exhibit.

The trial court initially sustained Licensee's statutory appeal,[6] stating the following at the completion of the hearing: "So I think [Licensee] may be using his deafness as an excuse and is not necessarily being truthful but I also think there is enough confusion and he may have had enough confusion that I am going to grant the appeal." December 15, 2016, Hearing, Notes of Testimony (N.T.) at 59-60;

---

[4] (*Id*., Commonwealth Exhibit 1; R.R. at 8-16a.)

[5] (*Id*., Defense Exhibit 1; R.R. at 78.1-78.2a.)

[6] Following the trial court's order sustaining Licensee's statutory appeal, the Department filed a notice of appeal and an application to remand the matter at Commonwealth Court Docket No. 185 C.D. 2017. It appearing that the trial court timely granted the Department's motion for reconsideration before the Department filed the notice of appeal, we entered a June 2017 order striking that notice of appeal as inoperative.

Reproduced Record (R.R.) at 47a.) Following the Department's motion for reconsideration and oral argument from both attorneys, however, the trial court subsequently denied Licensee's statutory appeal.

In support of the denial, the trial court determined that Licensee's voluntary actions were tantamount to a refusal.[7] (Op. at 3-4.) In addition, it determined that Licensee was capable of knowingly and consciously refusing to submit to chemical testing. In support, it reasoned as follows:

> The DL-26 form was read to [Licensee], and [he] was given the opportunity to read the form. [Licensee] removed his hearing aids and refused to acknowledge the troopers when they attempted to read him the DL-26. Although [Licensee] required the assistance of translators at the hearing, [he] testified he went to school, understands English and is able to send and receive text messages. Additionally, [Licensee] and his wife verbally communicated to each other at the time of his arrest in the presence of the troopers.

(*Id*. at 3.) The trial court also noted Licensee's failure to present expert testimony regarding his reading comprehension level. (*Id*. at 5.) Licensee's timely appeal followed.[8]

---

[7] *See Dep't of Transp. v. Renwick*, 669 A.2d 934, 939 (Pa. 1996) (a refusal to submit to chemical testing occurred where a licensee closed her eyes, turned her head, ignored the officer's requests, and exhibited gamesmanship by stating during a fleeting moment that she would assent to chemical testing).

[8] Licensee is not contending that the Department failed to establish its *prima facie* case for sustaining the suspension of a licensee's operating privilege, which requires that it prove the following:

> 1) licensee was arrested for [DUI] . . . by a police officer who had reasonable grounds to believe that he was operating or in actual physical control of the movement of the vehicle while under the influence;

4

The law is well established. Once the Department meets its burden of establishing a refusal, the burden shifts to the licensee to prove by substantial, competent evidence that his refusal was not knowing or conscious or that he was physically unable to take the test.[9] *Kollar v. Dep't of Transp., Bureau of Driver Licensing*, 7 A.3d 336, 339 (Pa. Cmwlth. 2010). The question of whether a licensee's decision to refuse to submit to chemical testing was knowing and conscious is a question of fact for the trial court. *Id.* at 340. If the licensee's inability to render a knowing and conscious refusal is caused, in whole or in part, by the consumption of alcohol, he or she is precluded from meeting that burden as a matter of law. *Lanthier v. Dep't of Transp., Bureau of Driver Licensing*, 22 A.3d 346, 349 n.2 (Pa. Cmwlth. 2011). Additionally, a hearing impairment can prevent a licensee from rendering a knowing and conscious refusal. *Landsberger v. Dep't of Transp., Bureau of Driver Licensing*, 717 A.2d 1121, 1124 (Pa. Cmwlth. 1998); *Dep't of Transp., Bureau of Driver Licensing v. Gaertner*, 589 A.2d 272, 272 (Pa. Cmwlth. 1991). Nonetheless, a trial court may determine that a licensee was capable of rendering a knowing and conscious refusal based on evidence that a licensee heard and understood what was asked of him, followed instructions, and did not ask that anything be repeated. *Landsberger*, 717 A.2d at 1124.

---

2) licensee was requested to submit to chemical testing;

3) licensee refused to submit to chemical testing; and

4) licensee was specifically warned that refusal would result in the suspension of his operating privilege.

*Kollar v. Dep't of Transp., Bureau of Driver Licensing*, 7 A.3d 336, 339 (Pa. Cmwlth. 2010).

[9] On page twenty-two of his brief, Licensee asserts that "[t]he Commonwealth failed to establish that [he] made a knowing and conscious decision to refuse to submit to chemical testing following his arrest." (Licensee's Brief at 22.) As stated above, Licensee bears that burden.

5

In the present case, we conclude that the accepted evidence of record supports the trial court's determination that Licensee failed to prove that his hearing impairment and alleged inability to read precluded him from rendering a knowing and conscious refusal. As the record reflects, Licensee engaged in verbal communication with the troopers at the traffic stop and responded appropriately to their verbal directives. For example, he answered "no" in response to a request to take a field sobriety test and verbally provided his address. (December 15, 2016, Hearing, N.T. at 25-26; R.R. at 59a.) The relevant testimony provides:

> [Department's counsel] Q. Did you notice anything unusual about him or did he tell you anything about his hearing capacity?
>
> [Trooper Pollick] A. He said that he was deaf but there are certain - - he could understand some things.
>
> Q. What leads you to conclude that?
>
> A. We were both speaking to him. I asked him for his keys. He provided me with his keys. He told me it was all right [sic] for me to I think move his vehicle from the spot it was parked. He asked me to move it off the roadway so it wasn't towed. He advised us where he lived.
>
> Q. He spoke those to you?
>
> A. Yes.

(*Id*. at 18-19; R.R. at 55-56a.)

In addition, Licensee verbally communicated with his wife at their home before going to the hospital. The pertinent testimony provides:

> [Licensee's counsel] Q. And at that point with his wife signing to communicate with him did it occur to you or to Trooper Buchheit - - did it occur that perhaps you should try to get him an interpreter, or signer, or someone who

6

could communicate with him in what is actually his own language?

[Trooper Pollick] A. No. Because he had been speaking with us. He also spoke with his wife. His wife also spoke back to him.

Q. How was his language when he spoke?

. . . .

A. It was slurred. It could have had everything to do with the alcohol. I have never spoken with him before.

(*Id*. at 22-23; R.R. at 57-58a.)

Moreover, the trial court's attempt to clarify what occurred at the house is instructive. The pertinent colloquy provides:

[Trial Court] Q. And when you got to the house did his wife speak to him?

[Trooper Pollick] A. She spoke to him and then she started doing I believe the signing but then he had called her, like I said, I believe a bitch and she left and we left.

Q. Do you remember what they - - what their conversation was? The speaking conversation?

A. I was asking her if she could translate and sign that he is going to the hospital, we are going to ask him to submit to a test and everything, we are going to need somebody to find him a ride. Along of [sic] those lines, Your Honor.

Q. But what did she say to him? Not sign to him but say to him? You said she spoke to him?

A. What happened, are you okay. I think along those lines.

Q. And he responded?

A. Yes.

Q. Verbally?

7

A. Yes.

(*Id.* at 26-27; R.R. at 59-60a.)

Further, the following testimony pertaining to what occurred at the hospital supports the trial court's determination Licensee voluntarily eschewed the opportunity to understand his rights. That testimony provides:

> [Department's counsel] Q. What happened when you read the [DL-26] form to him?
>
> [Trooper Pollick] A. As we were starting to read the form to him he took out his hearing aids. He slammed them on the table. We continued. He then turned his shoulders towards us. He would not make any type of - - he would not make any type of eye contact with us. We attempted five or six times.

(*Id.* at 20; R.R. at 56a.)

Additionally, the following testimony on cross-examination is illustrative:

> [Licensee's counsel] Q. Are you aware that Mount Nittany Medical Center has hearing impaired equipment on site that can assist people who are hearing impaired . . . ?
>
> [Trooper Pollick] A. Not that I am aware of. He understood everything that we were saying. He had acknowledged that he understood stuff.
>
> Q. Did he acknowledge that?
>
> A. Yes.
>
> Q. That he understood everything?
>
> A. When I was speaking to him he said that he understood me.
>
> Q. Well that's what he said but based upon what he said you assumed he understood?

8

A. I assumed that he was telling the truth that he understood.

(*Id*. at 23-24; R.R. at 58a.)

As the trial court determined, Licensee could engage in verbal communication and respond appropriately when he chose to do so. In addition, he failed to advise the troopers at the hospital that he would have difficulty reading the form.[10] In that regard, the trial court disregarded the testimony of Licensee's father that his son had issues with reading. Instead, it afforded weight to Licensee's testimony that he had attended school, understood English, and was able to send and receive text messages. (Op. at 3.) The weight of the evidence is exclusively within the purview of the factfinder, who is free to believe all, part, or none of the evidence and to determine the credibility of witnesses. *Reinhart v. Dep't of Transp., Bureau of Driver Licensing*, 954 A.2d 761, 765 (Pa. Cmwlth. 2008). Credibility determinations are within the province of the trial court and are improper questions for appellate review. *Id*. at 765-66

Moreover, the trial court emphasized that Licensee failed to present expert testimony regarding his reading comprehension level. *See Gaertner*, 589 A.2d at 274 (a hearing impaired licensee proved that he was incapable of making a knowing and conscious refusal by presenting expert testimony to the effect that he could not understand what was said to him or fully understand the form he read due

---

[10] Under certain circumstances, a police officer's act of giving a licensee the implied consent warnings to read is sufficient to communicate them. *See Weaver v. Dep't of Transp., Bureau of Driver Licensing*, 873 A.2d 1, 2 (Pa. Cmwlth. 2005), *aff'd*, 912 A.2d 259 (Pa. 2006) (verbiage on DL-26 form sufficient to inform a licensee of the implied consent law and to base a decision as to whether to submit to chemical testing); *Harris v. Dep't of Transp., Bureau of Driver Licensing*, 969 A.2d 30, 32 (Pa. Cmwlth. 2009 (*en banc*) (where a licensee interrupted the officer's oral recital of warnings and asked to read them himself, the written copy was sufficient to constitute an informed refusal).

9

to his limited reading capacity). In any event, it is well established that a police officer has neither a duty to ensure that a licensee understands warnings nor a duty to provide or permit an interpreter. *Martinovic v. Dep't of Transp., Bureau of Driver Licensing*, 881 A.2d 30, 35 (Pa. Cmwlth. 2005). An officer's sole duty is to inform licensees of the implied consent warnings; once he or she has done so, the obligation is satisfied. *Id*. [citing *Dep't of Transp., Bureau of Driver Licensing v. Scott*, 684 A.2d 539 (Pa. 1996)].

      Accordingly, we affirm.

                                      _____
                                        **BONNIE BRIGANCE LEADBETTER,**
                                        Senior Judge

Judge Cohn Jubelirer did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robin A. Fye, Sr.,                                    :
                Appellant           :
                            :
           v.               :    No. 519 C.D. 2018
                            :
Commonwealth of Pennsylvania,                          :
Department of Transportation,                          :
Bureau of Driver Licensing                             :

## O R D E R

AND NOW, this 7th day of December, 2018, the order of the Court of Common Pleas of Centre County is hereby AFFIRMED.

 

_____
**BONNIE BRIGANCE LEADBETTER,**
Senior Judge